## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

NEW BALANCE ATHLETIC SHOE, INC.

               Plaintiff,

   v.

LVMH MOET HENNESSY LOUIS VUITTON
SA, LOUIS VUITTON MALLETIER SA,
AND LOUIS VUITTON NORTH AMERICA
INC.,

               Defendants.

Civil Action No.  <u>1:09-cv-11497</u>

## <u>COMPLAINT</u>

1.     This case concerns the infringement of a distinctive and famous trade dress for a shoe known as the 574 model (the "574"), owned by plaintiff New Balance Athletic Shoe, Inc. ("New Balance"). Defendants LVMH Moet Hennessy Louis Vuitton SA, Louis Vuitton Malletier SA, and Louis Vuitton North America Inc. (together, "Louis Vuitton") recently began selling a virtually identical shoe called the "Minstrel":



2.     As set forth more fully below, the New Balance 574 is an iconic shoe that embodies the New Balance brand identity, and its core values of quality, authenticity, and fit.

The 574 is a casual "lifestyle" shoe, and the primary purpose and impact of the overall design is to identify New Balance as its source.

3.    Since its release in the mid-1990s, New Balance has spent millions of dollars promoting the 574 and developing consumers' exclusive association between the distinctive design and New Balance.  Most recently, the shoe became the centerpiece of a multi-million dollar advertising campaign called the "574 Location Program."  The media for the campaign highlights the grey/grey colorway and expressly ties the 574 to the core values of the New Balance brand.

4.    The 574 Location Program concept was developed independently by a third-party advertising firm that studied New Balance's history.  Based on its analysis, the firm identified the 574 as "*the*" iconic New Balance design.

5.    The 574 is extremely popular among the general public and within fashion and celebrity circles because of its exclusive association with New Balance as source.  The 574 is sold worldwide and is New Balance's best selling casual shoe model.  Since 2002, New Balance has sold more than 20,000,000 pairs of the 574 worldwide.  Between 2004 and 2005, New Balance sold over 13,000,000 pairs of the 574, making it one of the most popular sneakers sold by any manufacturer in the world during that time.

6.    Reflecting its popularity and iconic status, the 574 is often counterfeited and New Balance routinely enforces its trade dress rights through legal actions, including product seizures in Hong Kong and elsewhere.  New Balance has spent millions of dollars and thousands of hours protecting its goodwill in the design.

7.     The popularity of the 574 design has led New Balance, both on its own and with various artists and designers worldwide, to create different "special editions" of the 574 in upscale colors and fabrics.  These special editions are highly sought after and routinely sell out.

8.     Given Louis Vuitton's use of a virtually identical trade dress, ordinary consumers are likely to be confused and erroneously believe that New Balance has an affiliation, connection, or association with the Louis Vuitton Minstrel shoe, or that New Balance has sponsored or approved the use of the Minstrel design by Louis Vuitton.  This confusion will irreparably harm New Balance and the substantial goodwill it has developed in the 574 design.  Indeed, it is possible that had New Balance authorized Louis Vuitton to design a special Louis Vuitton edition of the iconic New Balance 574 shoe, the Minstrel might have been a highly successful collaboration.  New Balance, however, never authorized or licensed Louis Vuitton to use its trade dress.

9.     Louis Vuitton's conduct constitutes federal trademark infringement (15 U.S.C. § 1125(a)) and dilution (15 U.S.C. § 1125(c)), trademark infringement and dilution under the laws of the Commonwealth of Massachusetts, and statutory unfair competition under Mass. Gen. L. ch. 93A.

## PARTIES

10.     New Balance Athletic Shoe, Inc. is a Massachusetts corporation with its principal place of business at 20 Guest Street, Boston, Massachusetts 02135.

11.     Upon information and belief, defendant LVMH Moet Hennessy Louis Vuitton SA is a foreign business entity organized under the laws of the Republic of France, with a principal place of business at 22, avenue Montaigne, 75008 Paris, France.

12.     Upon information and belief, Louis Vuitton Malletier SA is a foreign business entity organized under the laws of the Republic of France, with a principal place of business at 22, avenue Montaigne, 75008 Paris, France.

13.     Upon information and belief, defendant Louis Vuitton North America Inc. is a Delaware corporation, with a principal place of business at 19 East 57th Street, New York, New York 10022.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331, 1332(a)(2), 1338(a) and (b), and this Court's supplemental jurisdiction under 28 U.S.C. § 1367.  Plaintiff corporation is a citizen of Massachusetts.  Upon information and belief, Defendant corporations are citizens of a foreign country, New York, or Delaware.  As such, there is complete diversity of the parties.  The matter in controversy exceeds $75,000, exclusive of interests and costs.

15.     Upon information and belief, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because this is the judicial district where (i) a substantial part of the events or omissions giving rise to the claim occurred; and (ii) where Defendants are subject to personal jurisdiction.

16.     Upon information and belief, Defendants regularly solicit and conduct business in the Commonwealth of Massachusetts.  Specifically, Defendants promote and sell their fashions, including the Minstrel shoe at issue here, within the Commonwealth of Massachusetts.  In addition, upon information and belief, Defendants or their agents operate stores located in Boston, Massachusetts and Natick, Massachusetts and maintain websites available in Massachusetts, www.lvmh.com and www.louisvuitton.com, which enable users to purchase goods.

## FACTS

17.     New Balance is a private company that was founded in 1906.  Today, New Balance is one of the largest shoe manufacturers in the world, with approximately 4,000 employees and more than $1.5 billion in annual sales worldwide.  It is one of the few sneaker companies that manufacturers sneakers in factories in the United States.

18.     Since its earliest days, New Balance has focused on fit and authenticity as its core brand message.  New Balance is one of the few sneaker manufactures to make shoes in true width sizing, rather than the more common narrow and wide.  Because of its brand qualities New Balance has the most brand loyal customers in the marketplace.  New Balance won the No. 1 Customer Loyalty Award in the athletic footwear category for eight consecutive years from Brand Keys, an independent group that identifies the brands that are best able to engage consumers and create loyal customers.

19.     During the 1980s sneakers became more than useful items, they became fashion or status symbols.  Other leading sneaker companies seized on this trend and employed celebrities and athletes to sell their shoes and tout their latest fashion forward designs.  Shoe companies became marketing companies that no longer manufactured their own shoes, but bought them from third-party factories overseas and spent millions on advertising.  New Balance famously refused to follow this trend, and kept its focus on technical fit and authenticity.  It even adopted the unofficial slogan "Endorsed by No One" to stake its position in the marketplace.  As a result of this focus on substance over popularity, New Balance shoes were typically not considered fashionable among those seeking a fashion shoe.

### The Origin Of The Iconic New Balance "Look"

20.     Beginning in 1983, New Balance developed a unique shoe design that came to embody its brand focus on substance over fashion – the 990 model.  The 990 was considered a highly technical running shoe at the time and the first shoe of its type to break the $100 price point.

21.     The 990 was an enormous success, selling millions of pairs.

22.     Following the success of the 990, in 1988 New Balance designed a new shoe – the 576 – that was intended to give consumers the iconic look of the 990 at a lower price point.



23.     The 576 was a huge success, also selling millions of pairs.

24.     Counter-intuitively and perhaps *because* of its un-fashionable look, the shoe was adopted by the fashion conscious and celebrities as an "it" shoe in the mid-1990s, particularly in Great Britain and France.

25.     For example, the 576 was prominently featured on the cover of the famous fashion magazine *Elle* in its France edition:





This was an extremely rare placement for a non-fashion product. The 576 also was a prominent

part of a fashion spread inside the magazine:





This exposure garnered enormous publicity for the 576 and New Balance among the fashion-conscious and the general public.

26.     The 576 also was featured on fashion runways by famous designer Lucien Pellat-Finet.  It was prominently worn by best-selling British rock groups such as Oasis, whose lead singer, Liam Gallagher, is reported to own hundreds of them.

27.     The adoption of the 576 by the fashion and celebrity set as the new "it" shoe essentially created a new market niche – the retro-looking "lifestyle" sneaker – for which the 576 was the inspiration.  *See, e.g.*, Exhibit A.  According to one British news article, "Anna Wintour, editor of American Vogue, and Naomi Campbell became fans [of the 576], [and] the boom in 'old school' trainers was on."  *See id.*

28.     Another British news article summarizes, "Twenty thousand were sent to Europe. Hip Paris department store Colette started stocking them and they were soon spotted by French fashion editors.  Hundreds of thousands were sent over, and they flew off the shop shelves."  *See* Exhibit B.

29.     As a result of this accidental fame, the 576 was identified in the British press as one of the top ten iconic sneaker designs of all time.  *See* Exhibit C.

## <u>The 574 and New Balance's Trade Dress Rights</u>

30.     With the emergence of the new lifestyle category, New Balance began selling casual shoes intended to cater to the athletic minded, but less technically demanding consumer. Recognizing that the classic 990 and 576 models defined the New Balance brand for its loyal consumers and that the 576 had become an accidental fashion icon, New Balance designed a new shoe, the 574, using many of the same distinctive design elements and trade dress:



31.     The 574 was designed to embody the New Balance brand and leverage the consumers' existing association of the 990 and 576 designs with New Balance as source.  It is expressly marketed as a "classic" lifestyle shoe.

32.     The 574 has been an enormous success and has supplanted both of its design predecessors (the 990 and 576 models) as New Balance's most famous, recognizable, and iconic shoe design.  Since 2002, New Balance has sold more than 20,000,000 pairs of 574s worldwide. Between 2004 and 2005, New Balance sold over 13,000,000 pairs of 574s – making it one of the most popular sneakers sold by any manufacturer in the world during that time.

33.     Its popularity has led New Balance to partner with licensors to use the 574 design as a platform for special editions.  For example, the 574 is used for New Balance's popular line

of children's sneakers bearing the famous Sesame Street characters.  The Sesame Street 574s are nationally advertised on the children's television network Nickelodeon, among other media.  Similarly, New Balance recently licensed Charles Schultz's famous Peanuts characters for another line of children's 574s.

34.     The 574 is also the design used by New Balance for special "limited edition" versions designed by the company or designed in collaboration with famous third-party designers or shops.  For example, in 2007 New Balance created a limited edition flag collection using the 574 design, which featured fabrics and colors intended to replicate the flags of several nations participating in the American Football World Cup.  Similarly, New Balance recently collaborated with designer Jeff Staple, the famous Japanese sneaker store Atmos-Tokyo, and on various limited edition 574s.

35.     Based on its fame and popularity, the 574 design has acquired secondary meaning.  New Balance has exclusively used the design since its release in the 1990s.  For over a decade, New Balance has been the sole source of the design.  The primary purpose of the design among consumers is to identify New Balance as source.

36.     Since its inception, New Balance has spent millions of dollars to advertise the 574 model.  In addition, the 574 is presently the subject of a multi-million dollar 574 Location Program campaign that is specifically designed to further associate the design with New Balance as source.

37. New Balance's distinctive 574 design is also widely associated in the mind of the public with the color grey.  Starting with the 990 design, and carrying through the 576 design to the 574, grey has been the color most emphasized in New Balance's trade dress.  The color is

emblematic of New Balance's core brand commitment to substance over style. As a result, the grey/grey colorway has been the best selling colorway for the 574.

38. The color grey is so firmly associated with New Balance and the 574, that the 574 Location Program marketing tagline is "Grey is Beautiful." The entire marketing campaign focuses on the fact that the color grey is the most iconic color for New Balance's most iconic shoe design.

39. The sales success of the 574 also evidences the secondary meaning in the design. As noted above, it was the most popular sneaker sold in the world in 2004-2005, selling more than 13,000,000 pairs.

40. The 574 is frequently the subject of unsolicited media coverage and has been repeatedly recognized for its popularity and iconic status. *See, e.g.*, Exhibit D.

41. The 574 has been the subject of articles and layouts in a variety of popular national and international newspapers and magazines, including, *Rolling Stone* (March 6, 2003), *Sports Illustrated Kids* (July 2003), *Lucky* (July 2003), *Rolling Stone* (April 1, 2004), *Lucky* (July 2004), *Sportswear International* (September/October 2004), *The Times of London* (London, September 18, 2004), *Kicksclusive* (November/December 2004), *Boston Magazine* (August 2005), *Stuff* (October 2005), *Details* (June/July 2006), *Scratch* (July/August 2006), *Urb* (July/August 2006), *Nylon* (October 2006), *Nylon* (April 2007), *SLAM* (April and May 2007), *Maxim* (May 2007), *Detroit Free Press* (June 30, 2007), *New York Post* (July 1, 2007), *Newsday* (July 2, 2007), *XXL* (July 2007), *What's On* (July 13-August 13, 2007), *Antenna* (Fall 2007), *Nylon* (Fall 2007), *Antenna* (Winter 2007). *See, e.g.*, Exhibit E.

42. The 574 is particularly popular among the fashion conscious and celebrity trend-setters. Celebrities frequently seen wearing 574s include T.R. Knight, Josh Hartnett, Cash

Warren, Elijah Wood, Blake Lively, Wentworth Miller, Ludacris, Will Ferrell, and Naomi

Campbell. *See, e.g.*, Exhibit F. New Balance pays none of these people to wear its shoes.

43.    New Balance's secondary meaning in the design is further evidenced by the fact

that the 574 is frequently the subject of attempts to counterfeit the design. Since its release, New

Balance has spent millions of dollars and thousands of hours protecting its rights in the design

through legal actions, including seizures of counterfeit goods in Hong Kong and elsewhere. For

example, New Balance pursues approximately twenty counterfeiting matters regarding the 574

each year, and can spend into the millions of dollars on its policing efforts. Many of these

actions have concerned attempts to counterfeit the shoe using the grey/grey colorway.

44.    The overall design of the 574 is not functional, rather each design element was

specifically chosen to reflect the heritage of its famous predecessor models (the 990 and 576)

and to identify the New Balance brand as source.

45.    By virtue of consumers' exclusive association of the non-functional 574 design

with New Balance, New Balance has developed protectable trade dress rights in its overall

design, including the shape and style of construction. Specifically, New Balance has developed

protectable rights in the 574 design which includes, among other elements, the combination of (i)

the shape or silhouette, comprised of a sole that shows its tread in profile and protrudes slightly

from the bottom rear and angles in towards the heel; a high back with a deep plunging collar; and

a slightly rounded toe on which the sole reaches up; and (ii) the style of construction, comprised

of an angled foxing at the heel, rising from mid-foot; an ankle collar defined by an open U-

shaped padding above a narrow V-shaped piece; a saddle rising from the mid-sole to the eyelets

and reaching around the lowest eyelet to form a single piece with the other side; a wave shaped

edge surrounding the tongue opening; a vamp open on top to show a separate piece of fabric; a

tongue with a label on top; visible stitching on panels; a black sole topped by the appearance of cut EVA sole with a contrasting sole wedge; the placement, angle, and size of a logo on the saddle consisting of a stylized initial; and the placement and size of the word mark on the rear of the ankle collar (the "New Balance Trade Dress").

46.     In addition, because of its consistent use of and emphasis on the color grey in connection with the New Balance Trade Dress, New Balance also has established protectable rights in the New Balance Trade Dress as used and marketed with a specific color combination comprised of a black/white/grey sole; fabric panels in shades of grey (in various fabrics, including nu-buck); and a contrasting collar liner.

### Defendants' Intentional Adoption of a Confusingly Similar Design

47.     Upon information and belief, in or about August 2009, Louis Vuitton began selling in interstate commerce a shoe that is confusingly similar to the New Balance Trade Dress:



Specifically, the Louis Vuitton "Minstrel" model uses the identical combination of elements that make up the shape and style of construction of the New Balance Trade Dress.  To the extent Defendants do not exactly copy the individual elements, when taken together the Louis Vuitton Minstrel is nonetheless virtually identical and confusingly similar to the New Balance Trade Dress.

48.    Louis Vuitton's deliberate attempt to trade off of the New Balance Trade Dress is clear from the fact that the principle color in which the Minstrel is offered is a grey/grey colorway that, in conjunction with the New Balance Trade Dress, is exclusively associated with New Balance as source.  Given the strong association between New Balance's Trade Dress and the color grey, the infringement is unquestionably intentional.

49.    Louis Vuitton's intent to trade off of New Balance's well-established secondary meaning and commercial strength in its Trade Dress has already been widely recognized. Numerous shoe and fashion commentators on the Internet acknowledge the fame of the New Balance Trade Dress and have commented on the striking similarity of the Louis Vuitton design. For example:

- **Louis Vuitton takes off New Balance 574**…[W]hen we caught a glimpse of this fall's lineup, **we saw a few too many familiar silhouettes made famous by other companies**.  The one that caught our attention the most was **a take off on the New Balance 574**.  **Besides minute changes such as toebox details and added metal eyelets the shoes are virtually identical**.  Louis Vuitton works with some of the biggest and brightest in the fashion industry, partnering with designers like Marc Jacobs and Takashi Murakami.  That said, one would expect a higher commitment from LV to imparting freshness to their upcoming collection while still demanding such prices.

  *See* http://nicekicks.com/2009/08/louis-vuitton-x-new-balance-574/, visited Sept. 2, 2009 (emphasis added).

- Louis Vuitton Fall 09 Sneaker Preview…**Are they sure these are Louis Vuitton and not New Balance! I guess we ran out of ideas!**

  *See* http://www.majorish.com/2009/08/louis-vuitton-fall-09-sneaker-preview.html, visited Sept. 2, 2009 (emphasis added).

- Louis Vuitton Fall 09 Sneaker Preview…**wait a minute,aren't [sic] those shoes in the top left a pair of New Balance 574's with a LV logo on it?**

  *See* http://ikeepsit100.blogspot.com/2009/08/louis-vuitton-fall-09-sneaker-preview.html, visited Sept. 2, 2009 (emphasis added).

- Louis Vuitton Fall 09 Sneaker Preview… The joints on the top left **look like New Balance kicks**, feeling any of them?

*See* http://realtalkny.uproxx.com/2009/08/topic/topic/gear/louis-vuitton-fall-09-sneaker-preview/, visited Sept. 2, 2009 (emphasis added).

- Louis Vuitton Fall Sneaker Collection…**Introducing the $400-$550 Louis Vuitton/New Balance renditions** (just kidding).

  *See* http://www.justinlawlor.com/2009/08/louis-vuitton-fall-sneaker-collection.html, visited Sept. 2, 2009 (emphasis added).

- New Louis Vuitton fall season collection. The collection consist of a couple of different styles and colors, for the most part they are good. **Some of the sneakers like [the] Grey and white one look like New Balances**.

  *See* http://houseofaura.com/?p=3647, visited Sept. 2, 2009 (emphasis added).

- Louis Vuitton Fall Sneaker Releases…**I even di[g] the new balance flavor shoe**. Its [sic] about staying classy but having that 'dress-down' aspect to it.

  *See* http://peppermintblowpops.com/2009/08/14/louis-vuitton-fall-sneaker-releases/, visited Sept. 2, 2009 (emphasis added).

- Louis Vuitton Swaggerjacks New Balance…**If you from the DMV, you know that New Balance have been a staple footwear for years in the area so its kinda odd to see Louis Vu[i]tton jack the 574's. Is this even legal.**

  *See* http://dalockerroom.com/index.php/2009/08/17/louis-vutton-swaggerjacks-balance/, visited Sept. 2, 2009 (emphasis added).

- TAKE A LOOK: @ **NEW BALANCE INSPIRED LOUIS VUITTON**…These have definately made it to my list of the "DOPEST SNEAKERS THUS FAR..." NO, I actually have a list. **For so many reasons, the New Balance has always been a clean, classic sneaker. I dont [sic] think you can go wrong with the neutral grey joints**…

  *See* http://dopeboyblogs.blogspot.com/2009/08/louis-vuitton-sneaker-new-balance.html, visited Sept. 2, 2009 (emphasis added).

50.    Louis Vuitton's shoe and the New Balance 574 are marketed and sold to overlapping classes of purchasers insofar as the New Balance 574 is extremely popular with sneaker aficionados and within fashion and celebrity circles, *i.e.*, among those who may choose to spend upwards of $500.00 for a casual sneaker.

51.    Louis Vuitton and New Balance advertise through overlapping marketing channels insofar as they use television, billboards, popular magazines, and the Internet to

advertise their goods.  In addition, both parties are routinely the topic of discussion in fashion magazines and on popular fashion websites and blogs.

52.     Upon information and belief, given the worldwide fame of the New Balance Trade Dress, Louis Vuitton was aware of the New Balance Trade Dress and copied it with the intent to free-ride on the consumer association between the design and New Balance and the enormous goodwill New Balance has developed in the design.  In addition, Louis Vuitton intended to dilute the distinctive source identifying quality of the New Balance Trade Dress.

53.     New Balance never authorized Louis Vuitton to use the New Balance Trade Dress.

54.     Louis Vuitton's use of a virtually identical design is likely to cause relevant consumers to be confused and to erroneously believe that New Balance has an affiliation, connection, or association with the Louis Vuitton shoe, or that New Balance has sponsored or approved the use of its trade dress by Louis Vuitton, to the irreparable harm and detriment of New Balance and the substantial goodwill it has developed in the design.

55.     Louis Vuitton's use of a virtually identical design also is likely to cause initial interest and post-sale confusion, to the irreparable harm and detriment of New Balance and the substantial goodwill it has developed in the design.

56.     Upon information and belief, Louis Vuitton is the world's most powerful luxury brand with more than twice the brand value of its next closest competitor.  Louis Vuitton's superior marketing ability and fame is likely to lead to reverse confusion because some relevant consumers will come to associate the 574 design with Louis Vuitton, not New Balance.  Even if reverse confusion does not occur, New Balance's goodwill will be damaged because it is likely to be wrongly perceived by relevant consumers as a less expensive version of the Louis Vuitton

shoe.  In other words, relevant consumers are likely to believe that New Balance – contrary to its brand image – is taking its design cues from fashion brands, rather than staying true to its own heritage running shoes.

57.    Finally, as a result of its leading position in luxury goods, Louis Vuitton products are routinely counterfeited.  Given its unique ability to elicit counterfeits, Louis Vuitton has a correspondingly unique ability to damage New Balance in the marketplace.  Specifically, Louis Vuitton's Minstrel shoe is likely to cause others to market and sell counterfeit Minstrel shoes, which also will infringe and dilute the New Balance Trade Dress.  Upon information and belief, in light of its knowledge of its brand strength, Louis Vuitton was aware of this unique risk when it chose to infringe the New Balance Trade Dress.

### COUNT I
### (False Designation of Origin—15 U.S.C. § 1125(a))

58.    New Balance repeats and realleges the allegations contained in paragraphs 1 through 57 above as if fully set forth herein.

59.    As described above, New Balance is the owner of the famous New Balance Trade Dress embodied in the model 574 shoe and predecessor models.

60.    The New Balance Trade Dress is distinctive and has acquired secondary meaning among consumers, who exclusively associate the design with New Balance.  The primary significance of the New Balance Trade Dress is to indicate New Balance as source.

61.    The New Balance Trade Dress is not functional.

62.    New Balance's ownership and use in commerce of the New Balance Trade Dress predates the use by Louis Vuitton of a confusingly similar design.

63.    Upon information and belief, given the fame of New Balance's Trade Dress, Louis Vuitton's conduct is willful and intentional and intended to free-ride off of New Balance's goodwill.

64.    Louis Vuitton uses the New Balance Trade Dress in interstate commerce in connection with the sale, offering for sale, distribution, and/or advertising of its goods or services.

65.    Louis Vuitton's use in commerce of the New Balance Trade Dress, as described above, constitutes false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A) in that it is likely to cause confusion, to cause mistake, or to deceive as to the affiliation, connection, or association of Louis Vuitton with New Balance and/or as to the origin, sponsorship, or approval by New Balance of Louis Vuitton's goods, services, or commercial activity, and will irreparably harm New Balance and the goodwill it has developed in the New Balance Trade Dress.

66.    As a direct and proximate result of Louis Vuitton's violations of 15 U.S.C. § 1125(a), New Balance has been and will continue to be damaged.

67.    Upon information and belief, Louis Vuitton has realized, and continues to realize, substantial profits and other benefits rightfully belonging to New Balance as a result of the wrongful conduct.

68.    Louis Vuitton's conduct is causing and will continue to cause New Balance to suffer irreparable harm and, unless Louis Vuitton is restrained, New Balance will continue to be so damaged, because it has no adequate remedy at law.

## COUNT II
### (Dilution—15 U.S.C. § 1125(c))

69.    New Balance repeats and realleges the allegations contained in paragraphs 1 through 68 above as if fully set forth herein.

70.     As described above, New Balance owns valid and existing trade dress rights in the New Balance Trade Dress.

71.     Through consistent and continued use, product promotion, and consumer and industry recognition, New Balance has developed the New Balance Trade Dress to the point that it is famous.  Louis Vuitton did not begin using the confusingly similar design in commerce until after the New Balance Trade Dress became famous.

72.     Upon information and belief, given the fame of New Balance's Trade Dress, Louis Vuitton's conduct is willful and intentional.  Louis Vuitton has adopted the New Balance Trade Dress take advantage of the goodwill and reputation established in the New Balance Trade Dress, and dilute the strength of the to New Balance Trade Dress.

73.     Louis Vuitton's design is virtually identical to the New Balance Trade Dress.

74.     Louis Vuitton's design is likely to cause dilution of the distinctive qualities of the New Balance Trade Dress in violation of 15 U.S.C. § 1125(c).

75.     As a direct and proximate result of Louis Vuitton's willful violations of 15 U.S.C. § 1125(c), New Balance has been and will continue to be damaged.

76.     Upon information and belief, Louis Vuitton has realized, and continues to realize, substantial profits and other benefits rightfully belonging to New Balance as a result of the wrongful conduct.

77.     Louis Vuitton's conduct is causing and will continue to cause New Balance to suffer irreparable harm and, unless Louis Vuitton is restrained, New Balance will continue to be so damaged, because it has no adequate remedy at law.

## COUNT III
### (Common Law Trademark Infringement)

78.     New Balance repeats and realleges the allegations contained in paragraphs 1 through 77 above as if fully set forth herein.

79.     As described above, New Balance is the owner of the famous New Balance Trade Dress embodied in the model 574 shoe and predecessor models.

80.     The New Balance Trade Dress is distinctive and has acquired secondary meaning among consumers, who exclusively associate the design with New Balance.  The primary significance of the New Balance Trade Dress is to indicate New Balance as source.

81.     The New Balance Trade Dress is not functional.

82.     New Balance's ownership and use in commerce of the New Balance Trade Dress predates the use by Defendants of a confusingly similar design.

83.     Upon information and belief, given the fame of the New Balance Trade Dress, Louis Vuitton's conduct is willful and intentional and intended to free-ride off of the goodwill associated with the New Balance Trade Dress.

84.     Louis Vuitton's use in commerce of a confusingly similar design, as described above, constitutes common law trademark infringement in that it is without New Balance's consent and creates a likelihood of confusion as to source.

85.     As a direct and proximate result of Louis Vuitton's common law trademark infringement, New Balance has been damaged and will continue to be damaged.

86.     Upon information and belief, Louis Vuitton has realized, and continues to realize, substantial profits and other benefits rightfully belonging to New Balance as a result of the wrongful conduct.

87.     Louis Vuitton's conduct is causing and will continue to cause New Balance to suffer irreparable harm and, unless Louis Vuitton is restrained, New Balance will continue to be so damaged, because it has no adequate remedy at law.

**COUNT IV**
**(Dilution—Mass. Gen. Laws ch. 110H § 13)**

88.     New Balance repeats and realleges the allegations contained in paragraphs 1 through 87 above as if fully set forth herein.

89.     As described above, New Balance is the owner of the New Balance Trade Dress embodied in the model 574 shoe and predecessor models.

90.     The New Balance Trade Dress is distinctive and has acquired secondary meaning among consumers, who exclusively associate the design with New Balance.  The primary significance of the New Balance Trade Dress is to indicate New Balance as source.

91.     The New Balance Trade Dress is not functional.

92.     Upon information and belief, given the fame of the New Balance Trade Dress, Louis Vuitton's conduct is willful and intentional and intended to free-ride off of the goodwill associated with the New Balance Trade Dress.

93.     Louis Vuitton's use in commerce of the New Balance Trade Dress, as described above, constitutes common law dilution in that it is without New Balance's consent and creates and will continue to create a likelihood of injury to New Balance's business reputation and/or a likelihood of dilution of the distinctive quality of the New Balance Trade Dress.

94.     As a direct and proximate result of Louis Vuitton's common law dilution, New Balance has been damaged and will continue to be damaged.

95.    Upon information and belief, Louis Vuitton has realized, and continues to realize, substantial profits and other benefits rightfully belonging to New Balance as a result of the wrongful conduct.

96.    Louis Vuitton's conduct is causing and will continue to cause New Balance to suffer irreparable harm and, unless Louis Vuitton is restrained, New Balance will continue to be so damaged, because it has no adequate remedy at law.

### COUNT V
### (Unfair Competition—Mass. Gen. Laws ch. 93A)

97.    New Balance repeats and realleges the allegations contained in paragraphs 1 through 96 above as if fully set forth herein.

98.    New Balance and Louis Vuitton are persons engaged in the conduct of trade or commerce within the meaning of Mass. Gen. Laws ch. 93A, § 11.

99.    As described above, New Balance is the owner of the famous New Balance Trade Dress embodied in the model 574 shoe and predecessor models.

100.    The New Balance Trade Dress is distinctive and has acquired secondary meaning among consumers, who exclusively associate the design with New Balance.  The primary significance of the New Balance Trade Dress is to indicate New Balance as source.

101.    The New Balance Trade Dress is not functional.

102.    Upon information and belief, given the fame of the New Balance Trade Dress, Louis Vuitton's conduct is willful and intentional and intended to free-ride off of the goodwill associated with the New Balance Trade Dress.

103.    New Balance's use in commerce of the New Balance Trade Dress, as described above, predates Defendants' use of a confusingly similar design.

104.    Louis Vuitton's acts, conduct, and practices described above occurred and are occurring primarily and substantially within the Commonwealth of Massachusetts.

105.    Louis Vuitton's acts, conduct, and practices described above, including without limitation the use of the New Balance Trade Dress in connection with the promotion, sale, or licensing of products in Massachusetts, constitute unfair methods of competition and/or unfair or deceptive acts or practices, which are unlawful under Mass. Gen. Laws ch. 93A.

106.    As a direct and proximate result of Defendants' violations of Mass. Gen. Laws ch. 93A, New Balance has been damaged and will continue to be damaged.

## PRAYERS FOR RELIEF

WHEREFORE, New Balance respectfully requests the following relief:

A.    That this Court declare that the New Balance Trade Dress is valid and enforceable;

B.    That this Court permanently enjoin Louis Vuitton, their employees, agents, servants, and all in privity with any of them, from using the New Balance Trade Dress, or any derivative thereof or any design similar thereto, in commerce;

C.    That this Court enter an order recalling all confusingly similar Louis Vuitton shoes presently manufactured and distributed;

D.    That this Court award New Balance Louis Vuitton's profits and/or compensatory damages in an amount to be determined at trial;

E.    That this Court award New Balance treble damages;

F.    That this Court award New Balance its attorneys' fees and costs; and

G.    That this Court award New Balance such other and further relief that this Court deems just and proper.

## JURY DEMAND

New Balance demands a trial by jury of all claims so triable.

Respectfully submitted,

NEW BALANCE ATHLETIC SHOE, INC.,

By its attorneys,

Dated: September 9, 2009

/s/ R. David Hosp
R. David Hosp (BBO No. 634091)
  dhosp@goodwinprocter.com
Mark S. Puzella (BBO No. 644850)
  mpuzella@goodwinprocter.com
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109-2881
Tel: (617) 570-1000
Fax: (617) 523-1231

LIBA/2023533.4